1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   GENE CAMARATA,                           CASE NO. C19-6236JLR

11          Plaintiff/Counter Defendant,      ORDER GRANTING
                                              MCDONALD'S
12     v.                                     CORPORATION'S MOTION FOR
                                              SUMMARY JUDGMENT
13   MCDONALD'S CORPORATION,

14          Defendant/Counter Claimant.

15                          I.     INTRODUCTION

16        Before the court is Defendant and Counter Claimant McDonald's Corporation's

17   ("McDonald's") motion for summary judgment.  (MSJ (Dkt. # 41).)  Despite receiving an

18   extension to respond to the motion (3/2/21 Order (Dkt. # 45)), *pro se* Plaintiff and

19   Counter Defendant Gene Camarata has not filed any opposition (*see* Dkt.).  The court has

20   reviewed the motion, the submissions filed in support of the motion, the relevant portions

21   //

22   //

of the record, and the applicable law.  Being fully advised,[1] the court GRANTS the motion.

## II.    BACKGROUND

This case centers on four domain names registered by Mr. Camarata that have been ordered to be transferred to McDonald's in two administrative domain name proceedings.  (*See* Compl. (Dkt. # 1-2).)  The court reviews first the factual background and then the procedural background.

### A.    Factual Background

McDonald's is "one of the world's largest restaurant chains" that is "in the business of developing, operating, and franchising an extensive system of restaurants under the McDonald's brand name that prepare, package, and sell a variety of high-quality, quickly-prepared, [and] modestly-priced foods and beverages."  (Fuelleman Decl. (Dkt. # 42) ¶ 41, Ex. 33 ("Hill Decl.") ¶¶ 4-5.)  As "the world's leading foodservice retailer," McDonald's owns numerous trademarks and other intellectual property, including the "McDONALD'S mark, its family of Mc-informative marks, and the mark of McD."  (Hill Decl. ¶¶ 6-8, Ex. 2 ("McD Trademark").)

McDonald's makes use of the McD mark for products used in its stores, its mobile application, and various domain names.  (*E.g.*, *id.* ¶ 9, Ex. 3 (using McD mark in hand soap brand), ¶ 10, Ex. 4 (using McD mark in mobile application "atmcd" or "@mcd"), ¶ 11, Ex. 5 (using McD mark in domain names atmcd.com, accessmcd.com and

---

[1] McDonald's does not request oral argument (*see* MSJ at 1), and the court finds that oral argument would not be helpful here, *see* Local Rules W.D. Wash. LCR 7(b)(4).

1    mcd.com), ¶ 12, Ex. 6 (using McD mark in its stock ticket symbol).)  Specifically, in

2    1993, McDonald's registered the domain name "mcd.com" and began assigning its

3    employees and executives email addresses that end in "@mcd.com." (*Id.* ¶ 15.)  Since

4    then, McDonald's has utilized more specific email address endings to reflect its

5    organizational structure, including the ending "@us.mcd.com" to denote United States

6    employees; "@us.stores.mcd.com" to denote United States restaurant personnel; and

7    "@partners.mcd.com" to denote franchisee-owned restaurant personnel.  (*Id.*)

8         Mr. Camarata registered the domain name "mcd.us.com" on June 20, 2019.

9    (Fuelleman Decl. ¶ 5, Ex. 4; *id.* ¶ 8, Ex. 7 at 5.)  He then registered the domain names

10   "partnersmcd.com," "storesmcd.com" and "usstoresmcd.com" in July of 2019.  (*Id.* ¶ 3,

11   Ex. 2.)  In registering "mcd.us.com," "partnersmcd.com," "storesmcd.com," and

12   "usstoresmcd.com" (collectively, "Disputed Domain Names"), Mr. Camarata used

13   fictitious names "Eburg City" and "Hello There," as well as a fake address "100 Hello

14   St., Ellensburg, WA." (*Id.* ¶ 35, Ex. 27 (fictitious names), ¶ 36, Ex. 28 (fictitious

15   address).)  Because the Disputed Domain Names look like McDonald's assigned domain

16   names, many people intending to e-mail McDonald's have wound up emailing Mr.

17   Camarata instead.  (Hill Decl. ¶¶ 16-17.)  For instance, if an individual wishing to email

18   McDonald's at "us.mcd.com" inadvertently transposes the "us" and "mcd," it results in

19   an email to Mr. Camarata at "mcd.us.com." (*Id.* ¶ 16.)  Similarly, those wishing to email

20   McDonald's franchisees at "partners.mcd.com" may mistakenly omit the period between

21   terms, resulting in an email to Mr. Camarata at "partnersmcd.com." (*Id.* ¶ 17.)

22   //

ORDER - 3

In August 2019, McDonald's first became aware of Mr. Camarata's use of the Disputed Domain Names when Mr. Camarata forwarded some messages sent in error to McDonald's.  (Fuelleman Decl. ¶ 7, Ex. 6 ("8/12/19 Email").)  Mr. Camarata explained in his email that he had "been registering a lot of domain names with catch-all email accounts" that "allows one to receive e-mails sent to the domain that might be misaddressed or misspelled."  (*Id.* at 1.)  As a result, he has received "hundreds—perhaps weekly—of misdirected emails" containing "important, private and confidential information."  (*Id.* at 1-2.)  He then attached two screenshots of erroneous emails sent to "partnersmcd.com."  (*Id.* at 2.)

Since then, Mr. Camarata has continued to email McDonald's on a frequent basis, forwarding misdirected emails and demanding compensation.  (*See* Fuelleman Decl. ¶¶ 8-10, Exs. 7-9 (collecting Mr. Camarata's emails).)  Qualifying his forwarding service as "invaluable," Mr. Camarata complains to McDonald's about the "time, expenses, labor and effort" that he has expended "for quite some time," opining that he should "start sending invoices for bills at $500.00 per hour."  (*Id.* ¶ 8, Ex. 7 at 5; ¶ 10, Ex. 9 at 10; *see also id.* at 30 (lamenting that he has "been working for nothing and at [his] own time and expense"); *id.* at 35 ("A problem is that everyone else is getting paid . . . while I get very little or nothing . . . while I do all the work.").)  In one message, he notes that he "[c]an't sort it out without funding" and asks to be "put . . . on the payroll . . . with a very high salary."  (*Id.* ¶ 10, Ex. 9 at 24; *see also id.* ¶ 9, Ex. 8 at 1 ("Please start providing substantial monetary compensation.").)  In another, he asks McDonald's Vice President of Global Marketing for "$250.00 for [his] services . . . Just ask how to contribute!"  (*Id.*

1  at 32.)  At times, he threatens to "deactivate the catch-all so the emails bounce back"

2  unless McDonald's provides "a couple of thousand dollars, to buy a laptop and other

3  expenses, in order to facilitate working on a possible resolution."  (*Id.* at 19.)

4       Additionally, Mr. Camarata threatens legal action against McDonald's for

5  exposing the private information within the misdirected emails.  (*Id.* ¶ 8, Ex. 7 at 5

6  (threatening to file lawsuits or complaints with agencies); ¶ 10, Ex. 9 at 20 (asking for

7  CEO's contact information to depose him); *id.* at 6 (noting possibility of appeal to Ninth

8  Circuit and Supreme Court).)  At other times, Mr. Camarata states that he will go to the

9  media, once opining that he would start his own media company if "major news outlets

10  are not reporting with clarity and [are] wishy-washy."  (*Id.* ¶ 8, Ex. 7 at 1 (threatening to

11  go to the "Wall Street Journal and New York Times"); *id.* ¶ 10, Ex. 9 at 37.)

12       On August 30, 2019, McDonald's filed a complaint with the World Intellectual

13  Property Organization ("WIPO") pursuant to the Uniform Domain Name Dispute

14  Resolution Policy ("UDRP"), which sets out the process for contesting domain name

15  registrations through private arbitrators.  (Fuelleman Decl. ¶ 20, Ex. 14(a).)  McDonald's

16  UDRP complaint objected to Mr. Camarata's use and registration of "partnersmcd.com,"

17  "storesmcd.com," and "usstoresmcd.com." [2]  (*Id.* ¶ 20, Ex. 14(b).)  While the complaint

18  was pending, Mr. Camarata registered another domain name, "mcd.ceo," which he named

19  //

20  _____

21       [2] McDonald's filed two UDRP complaints, the first of which challenged Mr. Camarata's use of all Disputed Domain Names.  (*Id.* ¶ 20, Ex. 14(a).)  Mr. Camarata's counsel objected that the WIPO lacked jurisdiction over any "third level domain names," such as those ending in "us.com."  (*Id.* ¶ 19, Ex. 15 at 2.)  Thus, McDonald's refiled a UDRP complaint that only

22  challenged the three domain names ending in ".com."  (*Id.* ¶ 20, Ex. 14(b).)

"Problems at McDonald's" and purported to feature grievances about McDonald's. (*Id.* ¶¶ 21-22, Exs. 16-17, ¶ 24, Ex. 19 ("UDRP Decision") at 5.) Mr. Camarata then contended that he registered the Disputed Domain Names to create a "gripe website" and complain about McDonald's. (UDRP Decision at 5-6.)

The UDRP administrative panel found for McDonald's. (*Id.* at 7.) First, it found that McDonald's established its rights in the McD mark and that the three domain names are identical or confusingly similar to the McD mark, as "each of the disputed domain names fully incorporate MCD." (*Id.* at 5.) It then found that Mr. Camarata had no rights or legitimate interests in those domain names and that the alleged "gripe" website set up at "mcd.ceo" "is not only pretextual but likely a *post hoc* justification." (*Id.* at 5-6.) Finally, the panel concluded that Mr. Camarata registered the domain names "to profit in bad faith from their connection to [McDonald's] email address endings." (*Id.* at 6-7.) The panel ordered that all three domain names be transferred to McDonald's. (*Id.* at 7.)

McDonald's also challenged Mr. Camarata's use of "mcd.us.com" under the CentralNIC Domain Name Resolution Policy ("CDRP"), which governs disputes over third-level domain names under "us.com." (Fuelleman Decl. ¶¶ 26-27, Exs. 21-22.) The parties participated in mandatory mediation but were unable to reach resolution. (*Id.* ¶ 25, Ex. 20 at 1.) Accordingly, on October 15, 2019, McDonald's filed a complaint with the National Arbitration Forum against "mcd.us.com." (*Id.* ¶ 26, Ex. 21.) The CDRP panel reached the same conclusions as the UDRP panel, finding that "the domain name was registered by [Mr. Camarata] in order to target [McDonald's] and create confusion with e-mail addresses used by [McDonald's] in its day-to-day business, and to do so for

1    [Mr. Camarata's] personal gain." (*Id.* ¶ 28, Ex. 23 ("CDRP Decision") at 5-7.) It too

2    ordered the transfer of "mcd.us.com" to McDonald's. (*Id.* at 7-8.)

3    **B.    Procedural Background**

4           Mr. Camarata filed the instant suit in state court under the Anticybersquatting

5    Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), to effectively appeal the

6    UDRP and CDRP panel decisions, as neither the UDRP nor the CDRP provides an

7    internal appeal process and instead directs the losing party to file a declaratory judgment

8    action to review panel decisions. (*See* Compl. ¶ 16.)[3] McDonald's removed this case to

9    federal court on December 24, 2019. (*See* Not. of Removal (Dkt. #1).) Additionally,

10    McDonald's counterclaimed that Mr. Camarata violated the ACPA and sought immediate

11    implementation of the ordered transfers. (Ans. (Dkt. # 2) ¶¶ 30-44.)

12           Mr. Camarata's attorney moved to withdraw, which was granted on May 27, 2020,

13    and Mr. Camarata has proceeded *pro se* since then. (*See* Mot. to Withdraw (Dkt. # 34);

14    5/27/20 Order (Dkt. # 35).) McDonald's filed the instant motion for summary judgment

15    on February 11, 2021. (*See* MSJ.) On March 1, 2021—the day that his response was

16    due—Mr. Camarata moved for an extension of time to respond, citing COVID-19 as a

17    barrier to accessing an "adequate computer at public libraries" and conducting "legal

18    research at law libraries." (*See* Mot. for Extension (Dkt. # 44).) The court granted him

19    until March 12, 2021, to oppose McDonald's motion. (3/2/21 Order at 2.)

20    //

21

22        [3] This suit initially involved only the "mcd.us.com" domain name. (*See* Compl.)
However, it was consolidated with another case involving the other three Disputed Domain
Names. (3/23/20 Order (Dkt. # 31) at 2.)

1    Despite Mr. Camarata's purported difficulty accessing computers, he registered an

2    additional domain name, "globalmcdonalds.com," on or around March 8, 2021.  (2d

3    Fuelleman Decl. (Dkt. # 47) ¶ 6, Ex. 4.)  Moreover, he has continued to email

4    McDonald's "nearly every day since February 11, 2021," including a few that were sent

5    around March 1, 2021.  (*Id.* ¶ 3, Ex. 2 (collecting Mr. Camarata's 18 emails sent to

6    McDonald's since its summary judgment motion).)  After the court's grant of the

7    extension, Mr. Camarata notified McDonald's counsel that he was "not going to respond"

8    to the motion and that he "will be immediately filing a notice with the 9th [C]ircuit[,]

9    whether it's premature or not."  (*Id.* ¶ 4, Ex. 3 (transcript of voicemail from Mr.

10   Camarata).)  True to his word, Mr. Camarata has not filed any opposition to McDonald's

11   motion.  (*See* Dkt.)

12                              **III.    ANALYSIS**

13   Although McDonald's motion for summary judgment is unopposed, a party's

14   failure to respond to a motion for summary judgment does not permit the court to grant

15   the motion automatically.  *See Heinemann v. Satterberg*, 731 F.3d 914, 916 (9th Cir.

16   2016) ("[A] motion for summary judgment may not be granted based on a failure to file

17   an opposition to the motion.").  Rather, the court may only "grant summary judgment if

18   the motion and supporting materials—including the facts considered undisputed—show

19   that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3); *see Heinemann*, 731 F.3d at

20   916.  Where facts asserted by the moving party in an unopposed motion are concerned,

21   the court may "consider the fact undisputed for purposes of the motion."  *Id.*  The

22   existence of a scintilla of evidence in support of the non-moving party's position is

1    insufficient to allow the non-movant to survive summary judgment.  *Anderson v. Liberty*

2    *Lobby*, 477 U.S. 242, 252 (1986).  Rather, "there must be evidence on which the jury

3    could reasonably find for the [non-moving party]."  *Id.*

4         McDonald's moves for summary judgment on its ACPA counterclaim, which

5    would necessarily defeat Mr. Camarata's claim for a declaration of non-infringement.

6    (*See* MSJ at 12-13); 15 U.S.C. § 1114(2)(D)(v) (requiring plaintiff to demonstrate his

7    registration of domain name is not unlawful to prevail on claim).  McDonald's must

8    establish that (1) it owns a valid and distinctive mark; (2) Mr. Camarata's use of the

9    Disputed Domain Names are identical to or confusingly similar to McDonald's mark; and

10   (3) Mr. Camarata has a bad faith intent to profit from the Disputed Domain Names.  *See*

11   *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1196-97 (9th Cir. 2009).  The court addresses

12   each element in turn.

13   **A.    Ownership of Valid and Distinctive Mark**

14        The undisputed evidence establishes that McDonald's owns the distinctive McD

15   mark.  Any federal trademark registration "shall be prima facie evidence of the validity of

16   the registered mark . . . [and] of the registrant's ownership of the mark."  15 U.S.C.

17   § 1115(a).  A mark is "plainly distinctive" when "the letters do not form a word in the

18   dictionary and there is no apparent logical connection to the goods, such as Exxon gas or

19   Xerox copiers."  *Lahoti*, 586 F.3d at 1197; *see also id.* at 1199 ("Registration alone may

20   be sufficient in an appropriate case to satisfy a determination of distinctiveness.").  Here,

21   McDonald's submits its federal trademark registration for the McD mark, issued years

22   before Mr. Camarata's registration of the Disputed Domain Names.  (*See* McD

1  Trademark.)  Moreover, "McD," much like "Exxon" or "Xerox," is not "a word in the

2  dictionary" and has "no apparent logical connection to [McDonald's] goods."  *See*

3  *Lahoti*, 586 F.3d at 1197.  The court concludes that there is no genuine issue of material

4  fact that McDonald's owns the McD mark and that the mark is distinctive.

5  **B.      Identical or Confusingly Similar**

6          It is also undisputed that the Disputed Domain Names are confusingly similar to

7  the McD mark.  The second element of the ACPA requires that the domain names at

8  issue be identical or confusingly similar to a protected mark.  *DSPT Inter., Inc. v. Nahum*,

9  624 F.3d 1213, 1218-19 (9th Cir. 2010).  Domain names may be confusingly similar "if

10  they incorporate the mark," "if they add, delete, or rearrange letters in the mark," or if

11  they "simply add[s] 'generic terms . . . [or] a top level domain suffix' to the plaintiff's

12  mark."  *Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1097 (N.D. Cal. 2014).  In *Catron*, the

13  domain name "BuyYelpReview.com" was held to be confusingly similar to the Yelp

14  mark because it "incorporates the Yelp [m]arks and simply add generic terms (i.e. 'buy'

15  and 'review') surrounding the Yelp [m]arks."  *Id.*

16          The same is true for the Disputed Domain Names.  "mcd.us.com" directly

17  incorporates the McD mark, as it simply transposes terms in the "us.mcd.com" domain

18  name owned by McDonald's.  The remaining domain names also incorporate the McD

19  mark and feature generic terms before it:  "partners" in "partnersmcd.com"; "stores" in

20  "storesmcd.com"; and "US" and "stores" in "usstoresmcd.com."  Indeed, Mr. Camarata

21  admits that the Disputed Domain Names were created as "catch-all email accounts" to

22  capture misdirected emails that were intended for McDonald's, a set-up that is premised

1   on the fact that the domain names are confusingly similar.  (*See* 8/12/19 Email at 1-2.)

2   The numerous emails that were, in fact, mistakenly sent to the Disputed Domain Names

3   further support that conclusion.  (*See* Fuelleman Decl. ¶¶ 8-10, Exs. 7-9.)  Accordingly,

4   there is no genuine issue of material fact that the Disputed Domain Names are

5   confusingly similar to McDonald's mark.

6   **C.   Bad Faith Intent to Profit**

7          Lastly, the undisputed evidence establish that Mr. Camarata registered and used

8   the Disputed Domain Names with a bad faith intent to profit from the McD mark.  In

9   evaluating bad faith, courts consider the "unique circumstances of each case," *Lahoti*,

10  586 F.3d at 1202-03, and are guided by the ACPA's nine non-exclusive factor list:

11       (1) the trademark or other intellectual property rights of the person, if any, in

12            the domain name;

13       (2) the extent to which the domain name consists of the legal name of the

14            person or a name that is otherwise commonly used to identify that person;

15       (3) the person's prior use, if any, of the domain name in connection with the

16            bona fide offering of any goods or services;

17       (4) the person's bona fide noncommercial or fair use of the mark in a site

18            accessible under the domain name;

19       (5) the person's intent to divert consumers from the mark owner's online

20            location to a site accessible under the domain name that could harm the

21            goodwill represented by the mark, either for commercial gain or with the

22            intent to tarnish or disparage the mark, by creating a likelihood of

confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(7) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(8) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(9) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B)(i).

//

1      Consideration of these factors in the context of the undisputed evidence evinces

2  that Mr. Camarata acted with a bad-faith intent to profit off of the McD mark.  Mr.

3  Camarata has no intellectual property rights in the Disputed Domain Names, nor do the

4  Disputed Domain Names concern Mr. Camarata's name, legal or otherwise.  *See* 15

5  U.S.C. § 1125(d)(1)(B)(i)(I)-(II).  Moreover, he supplied false names and a false address

6  in registering the Disputed Domain Names.  (*See* Fuelleman Decl. ¶ 3, Ex. 2; ¶ 5, Ex. 4;

7  ¶ 35, Ex. 27; ¶ 36, Ex. 28); *see* 15 U.S.C. § 1125(d)(1)(B)(i)(VII).  He has registered

8  multiple domain names that are confusingly similar to the McD mark—including some

9  after the commencement of this suit—and his statement that he had "been registering a

10 lot of domain names with catch-all email accounts" specifically to "allow[] one to receive

11 e-mails sent to the domain that might be misaddressed or misspelled" supports that he

12 knew those domain names were confusingly similar to McDonald's mark.  (8/12/19

13 Email; Fuelleman Decl. ¶ 21, Ex. 16 (registering "mcd.ceo"); 2d Fuelleman Decl. ¶ 6, Ex.

14 4 (registering "globalmcdonalds.com")); *see* 15 U.S.C. § 1125(d)(1)(B)(i)(VIII).  And as

15 discussed above, the McD mark is distinctive.  *See supra* § III.A; 15 U.S.C. § 1125

16 (d)(1)(B)(i)(IX).  All of these factors weigh towards a finding of bad faith.

17     Most significant, however, is Mr. Camarata's demonstrated use of the Disputed

18 Domain Names to capture misdirected emails and then forward those emails to

19 McDonald's with a request for payment.  There is no evidence that Mr. Camarata uses

20 the Disputed Domain Names for a bona fide offering of goods and services or another

21 //

22 //

ORDER - 13

bona fide noncommercial purpose.[4]  *See* 15 U.S.C. § 1125(d)(1)(B)(i)(III)-(IV).  Instead,

the numerous emails in evidence shows that Mr. Camarata intended to divert emails away

from McDonald's legitimate domain names so that he could use them for his own

commercial gain.  (*See, e.g.*, Fuelleman Decl. ¶ 8, Ex. 7 at 5 (threatening to send

"invoices for bills at $500.00 per hour"); *see* 15 U.S.C. § 1125(d)(1)(B)(i)(V).  Indeed,

Mr. Camarata's operation depends on "creating a likelihood of confusion as to the source

. . . [or] affiliation . . . of the site."  *See* 15 U.S.C. § 1125(d)(1)(B)(i)(V).  Furthermore,

Mr. Camarata then offers to sell McDonald's the information obtained through that

confusion, oftentimes redacting the sender's identifying information so that McDonald's

cannot reach out to the sender itself.  (*See generally, e.g.*, Fuelleman Decl. ¶ 8, Ex. 7.)

When he does not receive payment, he then makes veiled threats to sue or go to the

media.  (*See, e.g.*, *id.* ¶ 8, Ex. 7 at 5.)  The fact that Mr. Camarata has repeated this

process for several domain names—again, some of which he acquired after McDonald's

began this challenge—speaks to his pattern of bad faith conduct.  (*Id.* ¶ 21, Ex. 16; 2d

Fuelleman Decl. ¶ 6, Ex. 4; *see generally* Fuelleman Decl. ¶¶ 8-10, Exs. 7-9.)  The court

finds that against this undisputed record, there is no genuine issue of material fact that

Mr. Camarata acted with bad faith intent to profit from the McD mark.[5]

---

[4] The court agrees with the two panels that no evidence supports Mr. Camarata's attempt
to qualify the Disputed Domain Names as "gripe" websites.  (*See* UDRP Decision at 5-6; CDRP
Decision at 5-7.)  The undisputed evidence reveals that none of the Disputed Domain Names
originally featured concerns about McDonald's, and Mr. Camarata did not set up a "gripe"
website until after McDonald's had filed a complaint.  (*See* Fuelleman Decl. ¶¶ 21-22, Exs.
16-17.)  There is no evidence suggesting any other bona fide noncommercial use.

[5] The ACPA provides a "safe harbor" defense for registrants who reasonably believed
that their use of the domain name was fair or otherwise lawful.  15 U.S.C. § 1125(d)(1)(B)(ii).

1    In sum, the court finds no genuine issue of material fact as to McDonald's

2 ownership of the distinctive and valid McD mark, the confusingly similar nature of the

3 Disputed Domain Names to the McD mark, and Mr. Camarata's bad faith intent to profit

4 from the McD mark.  Accordingly, the court grants summary judgment to McDonald's

5 on its counterclaim asserting that Mr. Camarata violated the ACPA.  Because Mr.

6 Camarata's registration and use of the Disputed Domain Names are unlawful under the

7 ACPA, he cannot prevail on his declaratory judgment claim.  (*See* Compl. ¶ 16); *see* 15

8 U.S.C. § 1114(2)(D)(v).  Thus, the court also grants McDonald's summary judgment on

9 Mr. Camarata's claim.

10    **IV.    CONCLUSION**

11    For the foregoing reasons, the court GRANTS McDonald's motion for summary

12 judgment (Dkt. # 41).

13    Dated this 23rd day of March, 2021.

14

15    _____

16    JAMES L. ROBART
        United States District Judge

17

18

19

20    _____

21 Mr. Camarata has not invoked this defense (*see* Dkt.), nor is there any evidence to support such a
defense, *see Lahoti*, 586 F.3d at 1203 ("[A] defendant who acts even partially in bad faith . . . is
not, as a matter of law, entitled to benefit from the [ACPA's] safe harbor provision.").  Mr.
Camarata "has made his cybersquatter bed and now cannot persuasively challenge the . . .

22 conclusion that he must lie in it."  *Id.*